Upon review of all of the competent evidence of record with reference to the errors assigned, and finding no good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, the Full Commission AFFIRMS the Opinion and Award of the Deputy Commissioner as follows:
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. An employer-employee relationship existed between plaintiff and defendant-employer at all relevant times.
3. Hartford Insurance Company is the carrier on the risk.
4. Plaintiff's average weekly wage is to be calculated based on Social Security documents which have been submitted and stipulated to by both parties. In addition, a Form 22 has been submitted.
5. The following records have been stipulated to by both parties:
a. Medical records from Duke University
b. Medical records from Dr. D. Allen Hayes
 c. Stipulated medical records and exhibits numbers 1-6.
1. Joint Exhibit 1 (36 pp.)
2. Joint Exhibit 2 (28 pp.)
3. Joint Exhibit 3 (18 pp.)
4. Joint Exhibit 4 (20 pp.)
5. Joint Exhibit 5 (4 pp.)
6. Joint Exhibit 6 (11 pp.)
6. The issues to be resolved are:
 a. Does plaintiff suffer from occupational diseases; Reactive Airways Disease (RAD) and Rhinosinusitis caused by exposure to chemicals while employed by defendant-employer?
 b. If plaintiff suffers from occupational diseases, is he disabled? To what benefits is plaintiff entitled?
 *********
Based upon review of the competent evidence presented herein, the Full Commission adopts the Findings of Fact of the Deputy Commissioner and finds as follows:
 FINDINGS OF FACT
1. Plaintiff is a 36 year old man who obtained a GED. Plaintiff worked for a variety of employers including: a car wash, a cable television station, the Wilson County Sheriff's office, IBM, an electric company, a grocery store, Field Distributing Company, a grain and feed delivery company, Schwan Sales, and a health spa. Plaintiff was active in martial arts and bicycling.
2. Plaintiff began employment with defendant-employer on March 19, 1985 and worked there for approximately thirteen months through April, 1986. Defendant-employer mixes and delivers concrete. Plaintiff was hired as a truck driver and worked in that capacity for three months, after which he became a dispatcher/assistant manager. Plaintiff's average weekly wage during this time was $278.51.
3. While plaintiff was a truck driver, his duties included delivering concrete to a site and washing the truck interior. He was also required, from time to time, to clean the barrel of the truck. When there was time, or if the truck were particularly dirty, plaintiff was required to wash the outside of the concrete truck behind the cab with a solution of five parts water to one part cleaning compound by trade name Brex Concentrate, which contained muriatic or hydrochloric acid (HCL). Brex was mixed and used in a bucket, outside in the open air, and applied to the truck using a six foot brush. Plaintiff was told to use very little Brex and lots of water in the mixture because the Brex was expensive. Truck drivers would wash the trucks using the Brex mixture occasionally as often as three times a week but commonly no more than once a week. Cleaning took from five minutes to one hour. The Brex mixture was never used inside the barrel of the concrete truck.
4. The MSDS sheets, as submitted into evidence for the compounds, contained in Brex concentrate warn that acute exposure to the concentrate can cause skin burns and severe irritation of the upper respiratory tract. Chronic exposure may produce laryngitis, glottal edema, bronchitis, pulmonary edema and death.
5. On three or four occasions while he was a driver, plaintiff was required to enter the drum or barrel of the concrete truck to clean. While inside the barrel, plaintiff cleaned the hardened concrete using a hose. Plaintiff was provided with a dust mask, glasses, and hearing protection which he wore. The mask and glasses provided adequate protection from the cement dust.
6. Plaintiff left his employment with defendant-employer on April 15, 1986. Plaintiff had a dispute with the plant manager, Ken Hawley, and stopped going to work.
7. Plaintiff claims he began to have constant sinus problems, headaches, and his face and head hurt after he began work for defendant-employer. However, plaintiff did not seek medical attention from anyone until November 6, 1986, seven months after leaving defendant-employer. Plaintiff's lack of credibility and failure to seek medical attention as discussed infra puts his assertion of problems into doubt.
8. After leaving defendant-employer, plaintiff went to work for City Beverage Company as a route salesman. Beginning August 25, 1986, plaintiff began work as a route supervisor for Dodd Distributing Company. Plaintiff worked continuously for Dodd from August 25, 1986 until July 4, 1989.
9. After he began working for Dodd, plaintiff had recurring head colds, sore throats, and sinus problems. He presented to Dr. Clifford Baggett on November 6, 1986 complaining of a stopped up nose, sneezing, and itchy throat. Plaintiff was treated by Dr. Baggett on November 6, 1986 and again on December 9, 1986. Dr. Baggett diagnosed plaintiff with sinus problems. Plaintiff neither returned to Dr. Baggett nor did he seek any other medical attention until July 2, 1987, when he presented to the Nash General Hospital Emergency Room complaining of a nose bleed. Plaintiff also complained of one asthma attack at this time, the first time such a complaint was made.
10. Plaintiff next sought medical attention on January 13, 1988, when he presented to Dr. Kent Carr complaining of shortness of breath. Dr. Carr diagnosed bronchospasm and asthma. He prescribed inhalers. Plaintiff, at that time, had recently lost 50 pounds and was very active physically. Plaintiff complained of shortness of breath and intermittent wheezing about 6 to 7 weeks prior to January 13, 1988, after a long bike ride.
11. Plaintiff was treated by Dr. Carr on a few more occasions but was eventually referred to Dr. Herbert Sieker at Duke University. Dr. Sieker, after examining plaintiff on March 1, 1988, diagnosed him as having rhinosinusitis and bronchitis. Soon thereafter, plaintiff underwent an adenoidectomy to remove a mass in his nasopharynx. Immediately following the adenoidectomy, plaintiff had difficulty with shortness of breath and was admitted to the Duke University Medical Center. He was eventually diagnosed with acute asthmatic bronchitis and hypersensitivity pneumonitis.
12. Following his release from Duke Medical Center, plaintiff continued to work for Dodd Distributing and did not seek medical treatment again until November 14, 1988, when he presented to Dr. Hart at Raleigh Internal Medicine. Dr. Hart diagnosed exercise induced asthma. Plaintiff then saw Dr. William Fulkerson at Duke University on four occasions between March 1989 and July 1990, and then again in January 1993. Plaintiff did not report symptoms of wheezing from 1990 to January, 1993. Moreover, plaintiff did not seek any medical attention between July 1990 and January 1993.
13. Plaintiff never informed defendants or any of his medical providers until January, 1993, of problems with health stemming from exposure to HCL. He never reported shortness of breath, wheezing, or other lower respiratory symptoms while he was working for defendant-employer.
14. Plaintiff had difficulty breathing while employed at Dodd, where he was exposed to dust, diesel fumes and cold temperatures. While there, plaintiff was often sick with bronchitis, sinusitis and asthma attacks. Plaintiff left his employment with Dodd on July 4, 1989 after being criticized by the manager, Tom Henderson, for insufficient performance.
15. Since leaving Dodd, plaintiff has worked briefly for other employers but has not been able to keep any job. He worked for Lee Motor Company as a car salesman; however, odors there made him short of breath. He worked as a security man for Carolina Management but had problems from cigarette smoke that led to asthma attacks on the job. He applied to many other employers who would not hire him when they learned about plaintiff's breathing problems as reported by plaintiff. Plaintiff is now the sole caretaker of his three children, ages 4, 2, and 1, while his wife and ex-wife both work outside the home (at the time of the hearing before the Deputy Commissioner). Plaintiff does not drive and does not leave the house while his wife is working 18 hour shifts as a nurse.
16. Since leaving Dodd in 1989, plaintiff's symptoms of shortness of breath, asthma attacks and sensitivity to different fumes or odors have persisted. In addition to diesel fumes, cigarette smoke, dust, and cold weather; he is bothered by cosmetics, cooking odors, gas or oil fumes, and fresh cut grass. He was required to visit the hospital emergency room on several occasions due to severe asthma attacks. In order to control his pulmonary problems, plaintiff has severely limited his activities. He purchased three air cleaners and installed them in his home. He took responsibility for taking care of his children, which he does from his home. When he leaves the house, he keeps car windows rolled up to avoid dust and gasoline fumes. He no longer is physically active. As a consequence of his inactivity, plaintiff has gained considerable weight.
17. Plaintiff was examined by Dr. Ted Kunstling for the Industrial Commission at Raleigh Internal Medicine on November 15, 1993. Plaintiff gave occupational and medical histories to Dr. Kunstling at substantial variance from the testimony and records presented at the hearing. Based upon the inaccurate history, Dr. Kunstling diagnosed asthma related to repeated exposure to hydrogen chloride fumes (muriatic acid) in a poorly ventilated environment, namely the barrel of the concrete truck. The most significant factor in Dr. Kunstling's diagnosis was plaintiff's alleged exposure to hydrogen chloride fumes inside the concrete truck drum. Not only was plaintiff not exposed to HCL in a closed environment, he was protected from cement dust on the rare occasions he was inside the truck drum. The dust mask worn by plaintiff while he cleaned the cement from inside the truck was sufficient protection so his exposure to cement dust was not the cause of plaintiff's respiratory problems.
18. In August 1994, upon the referral of defendants in this case, plaintiff was examined by Dr. Allen Hayes, also of Raleigh Internal Medicine. Dr. Hayes' findings were very similar to those of Dr. Kunstling. Dr. Hayes diagnosed plaintiff as having bronchial asthma with bronchial hyperactivity and chronic rhinosinusitis. Dr. Hayes also erred in relying on the inaccurate and erroneous medical history given by plaintiff.
19. Plaintiff was also examined by Dr. Herbert Saltzman in 1995, who diagnosed plaintiff with three medical problems: (1) a breathing problem triggered by occupational exposure which he later characterized as reactive airway dysfunction (RADs); (2) a history of allergy independent of occupational exposure, seasonal hay fever and asthma, also independent of occupational exposure; and (3) a history and unambiguous findings of esophagitis, Barrett's esophagus, and gastroesophageal reflux, which can trigger coughing and wheezing, all unrelated to plaintiff's occupation or employment with defendant-employer. In addition, Dr. Saltzman diagnosed plaintiff with problems of anxiety and depression. Dr. Saltzman also relied to his detriment, on plaintiff's misrepresentations concerning his exposure to HCL at defendant-employer's. Dr. Saltzman based his opinion regarding the cause of plaintiff's RAD's being the occupational exposure to HCL, on the inaccurate descriptions plaintiff had previously related to Dr. Kunstling and Dr. Hayes. It is notable however, that Dr. Saltzman found all of plaintiff's additional medical complaints and problems to be unrelated to occupational exposure.
20. Medical opinions voiced by plaintiff's physicians suggest a causal relationship between his condition and his work duties. However, since these opinions are based upon suppositions stemming from inaccurate and deceiving facts, the conclusions themselves are not reliable. Dr. Kunstling himself agreed that once the medical history was revised to reflect plaintiff's actual employment history and exposure to HCL, the diagnosis and etiology of plaintiff's respiratory problems would change.
21. Plaintiff has given inconsistent accounts of the development of his alleged symptoms of occupational diseases. The medical history was untrue, which reflects poorly on the credibility of all plaintiff's testimony. Plaintiff admitted at the hearing that the medical history given to Dr. Kunstling was largely inaccurate. There are many inconsistencies between plaintiff's medical history and his testimony at trial concerning statements ranging from his mother's physical condition and medical history (history of asthma) to the reasons for plaintiff's leaving employment.
22. Plaintiff has multiple medical problems and psychiatric problems which pose limitations to him. However, plaintiff perceives himself as disabled and this is one of the major limiting factors in his ability to work. Plaintiff's anxiety and depression and psychological problems are not related to his inability to work or his occupational injury, but rather are a reflection of plaintiff's personality. Many of plaintiff's medical problems, including allergies, are independent of any occupational exposure. Plaintiff's seasonal hay fever, asthma, esophagitis, Barrett's Esophagitis and gastroesophageal reflux can trigger coughing and wheezing. Gastroesophageal reflux can cause or trigger coughs and allergies. Seasonal hay fever and asthma produce similar symptoms with or without occupational exposure.
23. Plaintiff did not prove by the greater weight of the competent, credible evidence in this case, that he developed an occupational disease due to causes and conditions characteristic of and peculiar to his employment with defendant-employers excluding all ordinary diseases of life to which the general public was equally exposed.
24. Plaintiff is not disabled as a result of the minimal exposure to respiratory irritants, such as HCL, he sustained while working at defendant-employer's. Plaintiff never missed any work while employed by defendant-employer and continued to work for Dodd Distributing for three years after leaving defendant-employer. Plaintiff did not have any lower respiratory problems until a few months prior to the adenoidectomy and subsequent hospitalization in March 1988, two years after leaving defendant-employer.
25. Plaintiff's surgery in March 1988 (adenoidectomy) either triggered or aggravated existing respiratory problems.
26. Plaintiff continued to work for a number of years after leaving defendant-employer. Plaintiff did not become disabled as the result of any exposure to respiratory irritants while working with defendant-employer. His current condition was aggravated due to exposure to irritants while he worked at Dodd Distributing.
28. Plaintiff's pulmonary function tests reveal minor abnormalities and have been consistent over the years. The only restriction limiting plaintiff's ability to work is that he must avoid respiratory irritants. Plaintiff's documented respiratory symptoms are mild. The evidence in this case suggests that plaintiff's respiratory problems do not limit his ability to sit, walk or stand in a work environment which would not expose him to respiratory irritants. Plaintiff can read, write, make change, sit, stand, bend, walk, lift, or engage in other activities that might be required in a job as long as there are no respiratory irritants present in the working environment. Plaintiff has a variety of skills as evidenced by his myriad of jobs. However, plaintiff has not sought any employment since 1990.
 *********
The foregoing findings of fact and conclusions of law engender the following additional
 CONCLUSIONS OF LAW
1. Plaintiff's testimony and other evidence which, if believed, would tend to establish that plaintiff developed occupational diseases is not accepted as credible. Concerning the credibility of a witness in a Workers' Compensation proceeding, Judge Hedrick, speaking for the Court of Appeals in Blalock v.Roberts Company, 12 N.C. App. 499 stated: "The Commission is the sole judge of the credibility of the witness and the weight to be given their testimony; it may accept or reject all of the testimony of a witness; it may accept a part and reject a part."Robbins v. Nicholson, 10 N.C. App. 421, 179 S.E.2d 183 (1981).
2. Much of the medical history reported by plaintiff, and upon which medical experts have based their opinions is not accurate. The medical opinions would have been completely different had accurate facts been presented by plaintiff. Therefore, no reliance is placed upon the medical experts' opinions related to causation and increased risk in this case.
3. The existence of a compensable occupational disease must be proven by a preponderance of the evidence indicating three basic elements: The disease must be characteristic of a trade or occupation; the disease must not be an ordinary disease of life to which the public is equally exposed outside of employment and there must be proof of causation between the disease and the employment. Plaintiff does not suffer from an occupational disease which is characteristic or peculiar to the occupation of a truck driver. Moreover, asthma, RAD and rhinosinusitis are diseases to which the public is equally exposed outside the employment. Booker v. Duke Medical Center, 297 N.C. 458,256 S.E.2d 189 (1979).
4. While proof of a causal condition between a disease and employment can be based on circumstantial evidence where a disease is merely characteristic of a profession and not peculiar to it, the Commission must consider potential non-work related causes as well. The Commission may consider: (1.) The nature and extent of the claimant's occupational exposure; (2.) The presence or absence of other non work related exposures and components which contributed to the disease's development; (3.) the relationship between claimant's work history and the development of the disease. Gay v. J.P. Stevens Co., 79 N.C. App. 324, 331,339 S.E.2d 490 (1986). Plaintiff's occupational exposure to hydrochloric acid is suspect because of the lack of credibility of plaintiff's medical histories. In addition, plaintiff's exposure to muriatic acid was extremely limited and did not occur in a poorly ventilated environment but only outside and for extremely small time periods and over a period of only three months. Plaintiff also had work related exposures to chemicals while he was an employee of other companies, which contributed to the development of the respiratory problems plaintiff has.
5. When employment is not the exclusive cause of a disease, the factual inquiry which must be made is whether or not the occupational exposure was a significant factor in the development of the occupational disease, so that without such exposure the disease would not have developed to such an extent that it caused the physical disability resulting in plaintiff's incapacity for work. Rutledge v. Tultex Corp., 308 N.C. 85, 301 S.E.2d 359
(1983). Plaintiff has been diagnosed with a variety of medical problems, including allergies independent of any occupational exposure, seasonal hay fever, asthma unrelated to occupational exposure, esophagitis, Barrett's Esophagitis and gastroesophageal reflux which can trigger coughing and wheezing. Plaintiff's occupational exposure to muriatic acid while at defendant-employer's was not a significant factor in the development of an occupational disease, so that without such exposure, neither rhinosinusitis nor RADS would have developed to such an extent that it could cause the physical disability which plaintiff alleges. Id.
6. Plaintiff has only a mild impairment of respiratory function, rather than the environmental diseases of rhinosinusitis and RADS. Plaintiff is not completely disabled.
7. Due to the fact that plaintiff does not suffer from occupational diseases and is not completely disabled, plaintiff's claim for total disability must be denied. N.C. Gen. Stat. § 97-53.
8. Since plaintiff does not suffer from occupational diseases, he is not eligible for reimbursement for medical treatment and medication. N.C. Gen. Stat. § 97-25.
 *********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following
 AWARD
1. Plaintiff's claim for compensation under the Workers' Compensation Act is DENIED.
2. Each side shall pay its own costs.
 S/ __________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
S/ ________________ J. HOWARD BUNN, Jr. CHAIRMAN
S/ ________________ LAURA K. MAVRETIC COMMISSIONER